**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ALFONSO PAUL CAZARES, | ) | |
| | ) | Case No. 21 CV 2887 |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Hon. Matthew F. Kennelly |
| | ) | Hon. Mag. Susan E. Cox |
| LOUIS J. GARCIA, MANUEL A. GIRON, | ) | |
| SGT. KEVIN RAKE, UNKNOWN | ) | |
| EMPLOYEES OF THE CITY OF | ) | |
| CHICAGO, and the CITY OF CHICAGO, | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Defendants*. | | |

**COMPLAINT**

Plaintiff ALFONSO PAUL CAZARES, by and through his attorneys, Loevy & Loevy, complains of Defendants LOUIS J. GARCIA, MANUEL A. GIRON, SGT. KEVIN RAKE, UKNOWN EMPLOYEES OF THE CITY OF CHICAGO, and THE CITY OF CHICAGO, stating as follows:

**INTRODUCTION**

1. On May 31, 2019, Plaintiff was standing at a bus stop when Defendant Garcia and Defendant Giron approached and placed him under arrest.

2. During and immediately following Plaintiff's unjustified arrest, Defendants Garcia and Giron choked and punched Plaintiff and elbowed him in the mouth. Plaintiff was injured and required medical treatment.

3. There was absolutely no justification for Defendants Garcia and Giron's use of excessive force. Plaintiff was unarmed and not threatening anyone.

4. As a result of Defendants Garcia and Giron's egregious misconduct, Plaintiff suffered extreme pain and suffering.

5. Sadly, this is not the first time that Plaintiff was subjected to excessive force by Defendant Garcia.

6. Indeed, in July 2007, in almost identical circumstances, Defendant Garcia attacked and assaulted Plaintiff during an arrest.

7. Plaintiff sued Defendant Garcia and the City of Chicago for the violation of Plaintiff's constitutional rights during that arrest. The City of Chicago settled with Plaintiff.

8. Plaintiff is not the only citizen who has been subjected to Defendant Garcia's egregious misconduct. On information and belief, Defendant Garcia has long terrorized civilians in Plaintiff's neighborhood. Defendant Garcia has a well-established pattern of harassing, assaulting, and effectuating unjustified arrests of innocent civilians.

9. The City of Chicago has long been on notice about Defendant Garcia's pattern of unjustified uses of force against civilians, including his previous unjustified use of force against Plaintiff. Moreover, the City of Chicago is on notice that Defendant Garcia is not an anomaly—the City is aware that its officers use excessive force with impunity and have done so for decades.

10. Defendant Garcia is currently facing criminal charges for his brutality towards Plaintiff.

11. Plaintiff brings the instant action pursuant to 42 U.S.C. § 1983 to hold Defendants accountable for violating Plaintiff's constitutional rights, as well as to redress the pain and suffering that Defendants so cruelly caused him to endure.

## JURISDICTION

12. This action is brought pursuant to 42 U.S.C. § 1983 to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

13.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

14.     Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to this complaint occurred in this judicial district, and on information and belief the Defendants reside in this judicial district.

## PARTIES

15.     Plaintiff Alfonso "Pauly" Cazares is a 50-year-old Latino man who, at all times relevant to this action, was a resident of the City of Chicago.

16.     At all times relevant to the events described in this Complaint, Defendants Louis J. Garcia, Manuel A. Giron, and Sgt. Kevin Rake, were employed by the City of Chicago as police officers with the Chicago Police Department.

17.     Each individual Defendant acted under color of law and within the scope of his employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his individual capacity unless otherwise noted.

18.     Defendant City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Defendants. At all times relevant to the events described in the Complaint, each of the individual Defendants acted as agents or employees of the City of Chicago. The City of Chicago is additionally responsible for the policies and practices of the Chicago Police Department.

## FACTUAL ALLEGATIONS

19.     On May 31, 2019, Plaintiff was standing near a bus stop in the 8900 block of Commercial Avenue in Chicago, IL.

20.     Plaintiff did not have a firearm or any other weapon in his possession, pose any threat to Defendants, himself, or the public.

21. Defendants Garcia and Giron approached Plaintiff to place him under arrest. During the arrest, Defendants grabbed Plaintiff by the throat and punched him in the face.

22. After Plaintiff was handcuffed, Defendants Garcia and Giron purposely hit Plaintiff's head against their vehicle while pushing him into the backseat of the police vehicle.

23. Once in the backseat, Defendant Garcia placed his hands over Plaintiff's neck and choked him, preventing Plaintiff from breathing.

24. Defendant Giron also subjected Plaintiff to excessive force when Plaintiff was being choked in the backseat of Defendants' vehicle.

25. Defendant Garcia hit Plaintiff in the face with his elbow from the front seat, leaving Plaintiff bleeding profusely from the mouth in the back of Defendants' vehicle.

26. Defendant Giron observed Defendant Garcia use excessive force against Plaintiff and had a realistic opportunity to intervene but failed to do so.

27. Defendant Garcia observed Defendant Giron use excessive force against Plaintiff and had a realistic opportunity to intervene but failed to do so.

28. Indeed, it is clear from Defendant Giron's Axon bodycam video that Defendants Giron and Garcia were in close proximity to each other when Plaintiff was subjected to excessive force.

29. None of the force Defendants Garcia and Giron used against Plaintiff was reasonable or justified based on the conditions Defendants faced at that time.

30. Defendants Garcia and Giron did not provide Plaintiff with any medical care.

31. Defendants Garcia and Giron had notice that Plaintiff had a serious medical need requiring treatment, but despite that knowledge, failed to provide him with any proper medical care or access to medical care.

4

32. Plaintiff was eventually brought to the police station.

33. Defendant Rake spoke with Defendants Garcia and Giron at the station.

34. Defendant Rake reviewed Defendant Giron's Axon bodycam video with Defendants Garcia and Giron.

35. Defendant Rake was on notice of the excessive force used against Plaintiff and that Plaintiff had a serious medical need requiring treatment.

36. Despite having knowledge that Plaintiff had a serious medical need requiring medical treatment, Defendant Rake delayed Plaintiff's access to that treatment.

37. Plaintiff continued to bleed in a cell for hours at the police station before he was provided any care.

38. When the ambulance arrived to take Plaintiff to the hospital for treatment, Defendants gave Plaintiff the choice between going in the ambulance or taking an I-bond, which would allow Plaintiff to be released without having to pay bond on the promise that he would appear for the next court date.

39. On information and belief, Defendants offered Plaintiff an I-bond so that he would not receive treatment at a hospital where Plaintiff's injuries would be documented.

40. Plaintiff declined the I-bond and went to the hospital. At the hospital, Plaintiff received treatment for his injuries.

**Defendant Garcia's History of Using Excessive Force Against Plaintiff**

41. Defendant Garcia's attack on Plaintiff in May 2019 was not the first time he used excessive force against Plaintiff.

42. Indeed, Defendant Garcia has a history of harassing and arresting Plaintiff.

5

43. For example, on July 14, 2007, Defendant Garcia stopped Plaintiff near the 8300 block of Buffalo Street in Chicago, IL.

44. Plaintiff was not violating any laws, committing any crimes, or posing a threat to Defendant Garcia, himself, or any other member of the public. Regardless, Defendant Garcia proceeded to place Plaintiff under arrest.

45. During this arrest, Defendant Garcia beat Plaintiff on his head, nose, and mouth.

46. The unjustified charges of resisting a Peace Officer and assault were dismissed.

47. Plaintiff sued Defendant Garcia, Defendant Garcia's partner M. Heinzel, and the City of Chicago for excessive force, false arrest, and malicious prosecution. *See Cazarez v. Louis Garcia, et al.*, Case No. 2008 C 4307 (N.D. Ill.).

48. Plaintiff successfully settled his case against Defendant Garcia and the City of Chicago for his July 2007 wrongful arrest and excessive force.

49. Even after Plaintiff's lawsuit was settled, Defendant Garcia continued to harass and arrest Plaintiff for bogus, fabricated charges.

50. On information and belief, Defendant Garcia also has a history of harassing, using excessive force, and effectuating unjustified arrests of other citizens in Plaintiff's neighborhood.

**Defendants' Conduct is Part of CPD Policy and Widespread Practice**
**Policy and Practice of Using Excessive Force**

51. The Individual Defendants misconduct in this case was not an anomaly and instead forms part of a long-standing practice of excessive force by CPD officers. More than twenty years ago, in 1999, following two high profile police shootings, the City Council held public hearings on the prevalence of police brutality and unjustified shootings, as well as the failure of the Department's disciplinary system. At those hearings, members of the Council

assured the public that changes would be made to the Chicago Police Department policies and practices to address these issues.

52. On September 28, 1999, the then-Superintendent of Police gave a speech, highlighting problems with the City's policies and practices relating to the use of force. Then-Superintendent Hillard spoke specifically of the need for (1) better in-service training on the use of force, (2) an effective disciplinary system, and (3) officer accountability for the use of force.

53. In a review commissioned by the Superintendent, John Marshall Law School found that although the City of Chicago's written policy on the use of force was in compliance with the law, more training of police officers was necessary for the written policy to be effective in practice.

54. In January 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

55. A study performed a year later by the Justice Coalition of Greater Chicago concluded that the CPD lacked many of the basic tools necessary to identify, monitor, punish, and prevent police misconduct and brutality.

56. Although the City has long been aware that its supervision, training, and discipline of police officers are entirely inadequate, it has not enacted any meaningful measure to address that failure.

57. Redress promised by the City Council and the Superintendent has gone unfulfilled. In 2017, the Department of Justice concluded the following:

a. Deficiencies in CPD's training, supervision, accountability, and other systems had contributed to a pattern and practice of excessive use of force;

b. The CPD failed to review its force practices as a whole to identify problematic trends and patterns that endangered the officers and the community; and

c. The CPD failed to provide its officers with adequate guidance to understand how and when they may use force or how to safely and effectively control and resolve encounters to reduce the need to use force.

58. As a result of Chicago's inadequate training and supervision, officers on the streets are ill-equipped to make the necessary decisions on the use of force. The lack of training and supervision greatly increases the susceptibility of officers to improper and violent abuses of their police power through the unjustified use of force, such as the shooting of Plaintiff.

59. At the time that Defendant Garcia used excessive force on Plaintiff, the CPD had a widespread practice of using excessive force, especially against individuals of color.

60. On August 29, 2017, the Illinois Attorney General sued the City for, "engaging in a repeated pattern of using excessive force, including deadly force, and other misconduct that disproportionately harms Chicago's . . . Latino residents."

61. On July 27, 2018, less than a year before Plaintiff was subjected to excessive force by Defendant Garcia, the City and State of Illinois reached a consensus on structural reforms needed to address CPD's practice of using excessive force against Latino individuals like Plaintiff.

62. As part of the Consent Decree, the City agreed to implement de-escalation techniques to prevent or reduce the need for force; track and analyze incidents where CPD officers use force and/or a firearm; develop a training bulletin providing guidance on use of

8

weapons; and implement policies for supervision, investigation, and accountability relating to use of force by officers, among other things.

63. A recent independent monitoring report has found that the City has missed deadlines or is otherwise not in compliance with various agreed improvements related to use of force by CPD officers.

**The City of Chicago and Chicago Police Department's Policy and Practice of Impunity**

64. At all times relevant to the wrongful assault and prosecution of Plaintiff, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which members of the Chicago Police Department recommended charging an innocent person with a serious crime, and no Chicago Police officer has ever been disciplined as a result of his misconduct in any of those cases.

65. The City of Chicago and the Chicago Police Department have routinely failed to investigate cases in which Chicago Police officers used excessive force.

66. Prior to and during the period in which Plaintiff was choked and assaulted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago Police officers accused of serious misconduct. The City almost never imposes significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who, like Defendant Garcia, were repeatedly accused of engaging in misconduct.

67. In 2017, two years before Defendants assaulted Plaintiff, the U.S. Department of Justice issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to

9

invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

68. On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

69. The DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the Department of Justice found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints are sustained, discipline was inconsistent and unpredictable. All of the DOJ's conclusions were known to the City for years before Defendants attacked Plaintiff.

70. Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority."

71. Between 2004 and 2016, the City paid more than $500 million to settle or pay judgments in police misconduct cases, without even conducting disciplinary investigations in more than half of the cases, and while recommending discipline in fewer than 4% of those cases.

72. Between 2011 and 2015, nearly half of complaints filed against Chicago Police officers were not even investigated.

73. More than 95% of complaints against the Chicago Police are found to be "unsustained."

74. Less than 2% of complaints against the Chicago Police resulted in any discipline.

75. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

76. The failure of police supervision and discipline in the City of Chicago during the relevant time period is a fact admitted by City policymakers and Chicago Police officers.

77. Former Mayor of the City of Chicago Rahm Emanuel has acknowledged that a "code of silence" exists within the Chicago Police Department.

78. In December 2016, the President of the police officers' union in Chicago admitted that there is a "code of silence" in the Chicago Police Department.

79. In 2017, the U.S. Department of Justice found that current officers of the CPD and former high-level officials of the CPD acknowledged a "code of silence."

11

80. Mayor Lori Lightfoot urged federal prosecutors to examine the trial of Chicago Police officers accused of covering up the Laquan McDonald shooting, saying "[w]e've got to have transparency and healing."

81. The code of silence in the Chicago Police Department has been longstanding.

82. In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill.), a federal jury found that as of 1994 the Chicago Police maintained a code of silence that facilitated police misconduct.

83. In *Obrycka v. City of Chicago*, No. 07 C 2372 (N.D. Ill.), a different federal jury found that, as of February 2007, "the City had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

84. The same code of silence and ineffective system of police oversight were in place when Plaintiff's constitutional rights were violated in 2019.

85. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens. This includes Defendants in this case.

**Plaintiff's Injury**

86. As a result of Defendants misconduct, Plaintiff suffered physical injury, pain, and emotional distress. Plaintiff is left with continuing physical and emotional pain.

**COUNT I**
**42 U.S.C. § 1983 – Excessive Force**
**Fourth Amendment**
**(Defendants Garcia and Giron)**

87. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

88. In the manner described more fully above, Defendants violated Plaintiff's Fourth Amendment right to be free from unreasonable force when they punched, choked, and elbowed Plaintiff in the face.

89. As a result of Defendants' misconduct described in this Count, Plaintiff suffered serious physical injury, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

90. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT II**
**42 U.S.C. § 1983 – Unreasonable Denial of Medical Care**
**Fourth and Fourteenth Amendments**
**(Individual Defendants)**

91. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

92. In the manner described above, Defendants had notice of Plaintiff's serious medical needs, and yet they failed to provide him with necessary medical attention. They further intervened in or prevented the provision of medical care by others, in violation of the Fourth and Fourteenth Amendments of the United States Constitution.

13

93. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Plaintiff's constitutional rights.

94. As a result of Defendants' misconduct, Plaintiff experienced and continues to experience pain, suffering, emotional distress, and physical injury.

95. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT III
### 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights
### (Individual Defendants)

96. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

97. In the manner described more fully above, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to use excessive force against Plaintiff and thereby to deprive him of his constitutional rights. They also agreed to fabricate evidence to cover up their use of excessive force against Plaintiff.

98. In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

99. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

100. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IV
### 42 U.S.C. § 1983 – Failure to Intervene
### (Defendants Garcia and Giron)

101. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

102. In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

103. As a result of Defendants' misconduct described in this Count, Plaintiff suffered serious physical injury, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages as set forth above.

104. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT V
### 42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago

105. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

106. As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

107. At all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice by officers and agents of the Chicago Police Department and the City of Chicago of using excessive force against individuals, especially individuals of color like Plaintiff.

108. These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

109. The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

110. At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: use of force; reporting incidents where excessive force was used. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

111. These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago.

112. In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final

16

policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

113. As a result of the policies and practices of the City of Chicago, numerous individuals have suffered injury or death resulting from unreasonable use of force.

114. Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT VI**
**Illinois Law – Indemnification**
**(Against the City of Chicago)**

115. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

116. Illinois statute (745 ILCS 10/9-102) provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

117. The Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

118. The City of Chicago is responsible to pay any judgment entered against the Defendants. Plaintiff therefore demands judgment against Defendant City of Chicago, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Alfonso Paul Cazares respectfully requests that this Court enter judgment in his favor against Defendants, awarding compensatory damages, punitive damages, attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief the Court deems just and appropriate.

**JURY DEMAND**

Plaintiff Alfonso Paul Cazares demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

Dated: September 13, 2021    Respectfully submitted,

                                                    BY:  /s/ Katie Roche
                                                          One of Plaintiff's Attorneys

Jon Loevy
Arthur Loevy
Theresa Kleinhaus
Katie Roche
311 N. Aberdeen Street 3rd Floor
Chicago, IL 60607
T: (312) 243-5900
F: (312) 243-5902
katie@loevy.com